IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

03 JAN 13 PM 2: 40

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| JOHNNY M. GRUBBS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 01-PT-2505-E |
| | ) | |
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, | ) ) | |
| | ) | |
| Defendant. | ) | |

ENTERED
JAN 13 2003

## MEMORANDUM OPINION

This cause comes on to be heard upon Defendant Prudential Insurance Company of America's ("Prudential") Motion for Summary Judgment, filed on August 22, 2002.

### FACTS AND PROCEDURAL HISTORY

Plaintiff Johnny Grubbs ("Grubbs") was employed with Morrison Knudsen Corporation ("Knudsen") as a Compliance Director/Quality Manager. *See* Def. Ex. A at 314. He was covered under Knudsen's Long Term Disability Plan ("the Plan") and an insurance policy. *See* Pl. Ex. 1; Def. Ex. E.[1] That policy was with Prudential. Grubbs has a history of severe coronary artery disease, having had two coronary bypass surgeries in 1987 and 1994. *See* Def. Ex. A at 314; Pl. Ex. 2 at 27, 38, 69, 173-76. In January 1996, Grubbs stopped working for Knudsen, claiming physical impairment due to his condition. *See* Def. Ex. A at 314. He then filed an application for long term disability benefits under the Plan. *Id.* The following are pertinent sections of the Plan:

---

[1] The court notes that the Parties have submitted two different versions of the Plan. Grubbs argues that it is submitting the same document that Prudential submitted with its Motion to Dismiss. While the two documents are different, they are also similar, and neither side has taken issue with portions of the Plan cited by the other.

Section 3.1: Monthly Benefit Payment:

A Monthly Benefit will be paid to a Participant who:

(a) becomes Totally Disabled while covered under the Plan;
(b) is Totally Disabled throughout the Elimination Period;
(c) remains Disabled beyond the Elimination Period; and
(d) submits proof of loss satisfactory to the Claims Administrator

Section 1.32: Totally Disabled

An Employee prevented by a Sickness or Injury from engaging in every duty pertaining to the Employee's occupation for profit during the Elimination Period and for the next six Months. After that, and for as long as he stays Totally Disabled, the Employee must be prevented by the disability from doing any occupation or work for pay, profit, or gain for which he is or could be qualified by:

(a) training;
(b) education; or
(c) experience.

However, Rehabilitative Employment will not be considered an occupation or work for profit for the purposes of this definition of Totally Disabled.

Section 1.16: Definition of Injury

Injury to the body of a Participant.

Section 1.31: Definition of Sickness

A disorder of the body or mind of a Participant.

Section 1.24: Definition of Physician

Any legally qualified physician. However, if Total Disability is due to mental, psychoneurotic, or personality disorder, the Physician also must be qualified to evaluate and treat mental illness through specialization and experience in psychiatric medicine.

*See* Pl. Ex. 1.[2]

On February 27, 1996, Grubbs received a letter informing him that he would begin receiving long term disability benefits beginning April 15, 1996. *Id.* at 274-76; Pl. Ex. 2 at 115, 148-53, 176. Grubbs received long term disability benefits uninterrupted for the next several years. His status was reviewed periodically, but his condition remained relatively unchanged.[3]

On or about January 2, 2001, Grubbs completed, at Prudential's request, an Activities of Daily Living Questionnaire. *See* Def. Ex. A at 223-30; Pl. Ex. 2 at 102-09. Grubbs reported that he was still experiencing various physical and cognitive problems; however, he also reported being able to engage in certain social and/or physical activities, such as golfing, fishing, shopping, traveling, and reading to grandchildren. *See* Def. Ex. A at 226-28; Pl. Ex. 2 at 103-06. After receiving this information, Prudential began contacting Grubbs' doctors. *See* Pl. Ex. 2 at 21, 24, 35, 41-43, 46, 60-61, 93-95, 97-99. Prudential gathered information from several doctors about Grubbs' various medical conditions. *See* Pl. Br. at 4-5; Pl. Ex. 2 at 27, 49-54, 26-34, 38-39, 56-57, 73-90. Several of these documents referred to Grubbs as "disabled" or as suffering from "dementia." *See, e.g.*, Pl. Ex. 2 at 27, 49-54.

Three documents are worth discussing specifically. On or about January 13, 2001, Dr. John Watkins, Grubbs' internist, completed a Physical Capacities Evaluation. *See* Def. Ex. A at 143-44; Pl. Ex. 2 at 49-50. Dr. Watkins indicated that Grubbs could "occasionally" perform activities such as stooping, reaching above his shoulders, reaching forward more than eighteen

---

[2] The document provided by Prudential is not organized in this way and does not contain some of these provisions.

[3] On or about February 1997, the Social Security Administration found Grubbs to be disabled pursuant to 20 C.F.R. § 404.1520(f). *See* Pl. Ex. 2 at 122, 125-30. Among other the things, the Social Security Administration found that "the claimant's impairments . . . prevent him from performing even sedentary work." *Id.*

inches, and driving automotive equipment. Dr. Watkins also stated that Grubbs could do some standing, walking, and lifting. Finally, Dr. Watkins stated that Grubbs' conditions would not affect his ability to do certain activities, such as reaching forward less than eighteen inches, operating foot controls, and handling/grasping objects. On February 19, 2001, Dr. Steven Nichols, Grubbs' orthopedic surgeon, also completed a Physical Capacities Evaluation. *See* Def. Ex. A at 150-51; Pl. Ex. 2 at 56-57. Dr. Nichols' statements were similar to Dr. Watkins', although Dr. Nichols did indicate that Grubbs could perform more activities for longer periods of time.

On April 3, 2001, Dr. Alfred Stanley, Jr., Grubbs' cardiologist, completed a Cardiac Functional Capacity Assessment form. *See* Def. Ex. A at 88; Pl. Ex. 2 at 20. Dr. Stanley stated that Grubbs' has an American Heart Association Cardiac Classification of Class III (out of four), and indicated that Grubbs could perform at a "light" physical demand level. Dr. Stanley also listed some of Grubbs' more serious medical conditions, and stated that Grubbs "remains limited."

Based on this documentation, Prudential referred Grubbs' file to Dr. Elizabeth Genovese for a medical consultant review and to Karen Carli for a formal vocational analysis. *See* Def. Ex. A at 80, 86; Pl. Ex. 2 at 19. Dr. Genovese concluded, after reviewing Grubbs' records (including the assessment from Dr. Stanley), that Grubbs was capable of sedentary work. *See* Def. Ex. A at 83-85; Pl. Ex. 2 at 16-18. However, Dr. Genovese's assessment was apparently based upon Grubbs' physical capacities only. *See* Pl. Ex. 7 at 28, 63-65. Ms. Carli also concluded that Grubbs had the capacity to perform work activities at the sedentary to light exertion level, and she identified three (3) alternative positions for which he was qualified. *See* Def. Ex. A at 76-

79.[4] In its request for an assessment, Prudential specifically directed Ms. Carli to examine the three Physical Capacity Evaluations completed by Grubbs's doctors and Dr. Genovese's report. *See* Def. Ex. A at 80. Ms. Carli never examined or interviewed Grubbs. *See* Pl. Ex. 6 at 8-9.

Based on these analyses, Prudential determined that Grubbs no longer met the definition of "total disability" under the Plan, and informed him that his benefits would be terminated effective May 31, 2001. *See* Def. Ex. A at 64-68; Pl. Ex. 2 at 5-10. On or about June 29, 2001, Grubbs sent a letter to Prudential requesting an appeal of the decision to discontinue his benefits. *See* Def. Ex A at 58. Grubbs stated in the letter that he was not able, physically or mentally, to return to work, due to his medical conditions. On July 27, 2001, Grubbs submitted additional information to substantiate his claim of total disability. Grubbs submitted a letter from Dr. Watkins stating, among other things, that Grubbs "would find functioning in a work-related environment very difficult." *See* Def. Ex A at 57; Pl. Ex. 2 at 181. Grubbs also submitted an affidavit from Dr. Stanley, who concluded that Grubbs was not capable or working, stating that "to the extent I may have indicated he was capable of resuming any form of gainful employment, such communication was in error considering the facts pertaining to his total medical picture." *See* Def. Ex. A at 56; Pl. Ex. 2 at 179. He noted that "[i]t is my opinion that when all conditions are considered . . . [Grubbs] is clearly not able to sustain any type of employment." More specifically, Dr. Stanley stated that Grubbs "is not capable of undertaking and successfully engaging in any of the jobs identified" by Prudential.

In response, Prudential contacted Grubbs' counsel on August 28, 2001, leaving a message requesting objective evidence of Grubbs' continued disability. *See* Def. Ex. A at 51.

---

[4]Those positions were "Budget Officer," "Controller," and "Director, Records Management."

After no documentation was provided, Prudential, on September 6, 2001, sent a letter to Grubbs' counsel also requesting objective evidence, and giving twenty-one (21) days for Grubbs or his counsel to respond. *Id.* at 49. No additional documentation was ever provided. On September 27, 2001, Dr. Bernard Stevens conducted a second review of Grubbs' medical information for Prudential. Dr. Stevens concluded that Grubbs was capable of performing sedentary work, provided that certain constraints were imposed. *Id.* at 44-46. On October 1, Ms. Carli completed a second vocational assessment, and concluded that Dr. Stevens' recommendations were compatible with the alternate occupations she listed in her first assessment. *Id.* at 42.

On October 4, 2001, Grubbs filed a complaint alleging bad faith, breach of contract, and seeking a declaratory judgment and specific performance. Grubbs later, by court order, amended his Complaint, dropping the state law claims and bringing his lawsuit as an ERISA cause of action. *See* Am. Compl. at 1. Grubbs seeks recovery of past and future benefits, attorney's fees, and any other legal and equitable relief due to him.

Since this lawsuit was filed, Prudential has deposed Grubbs's doctors. Both Dr. Watkins and Dr. Stanley stated that Grubbs is capable of performing sedentary work, at least from a cardiac standpoint. *See* Def. Ex. B at 31-32 (Watkins); Def. Ex. C at 22, 85 (Stanley). Both doctors stated that Grubbs may have certain cognitive problems as a result of his condition, but both admitted that they did not perform any psychological, neurological, or other tests on Grubbs, and that they are not qualified to make a cognitive or psychological assessment. *See* Def. Ex. B at 16-18; Def. Ex. C at 28, 43, 45-46, 88. Grubbs admits that he has never seen a psychologist, psychiatrist, or psychological therapist. *See* Def. Ex. D at 75-76.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477 U.S. at 323. "It is never enough [for the movant] simply to state that the non-moving party could not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted). The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial. *Celotex*, 477 U.S. at 324. The non-moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted). Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay*, 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer*, 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the

7

non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

## ARGUMENTS

### I. Standard of Review

Prudential notes that the Plan gives it discretionary authority to interpret the provisions of the plan. *See* Def. Ex. E at 317. Under Eleventh Circuit law, Prudential argues, when a plan grants the decision-maker discretionary authority, a court must review any plan decisions under the arbitrary and capricious or abuse of discretion standard. *See Brown v. Blue Cross & Blue Shield of Alabama, Inc.*, 898 F.2d 1556 (11th Cir. 1990). Accordingly, the only issue in this case is whether "there was a reasonable basis for the decision to deny benefits, based on the facts as known to the fiduciary at the time the decision was made." *Brown*, 898 F.2d at 1559; *see also Lee v. Blue Cross & Blue Shield of Alabama, Inc.*, 10 F.3d 1547, 1549 (11th Cir. 1994). Thus, "a district court should limit its review in such cases to consideration of the material available to [the administrator] at the time it made its decision." *Jett v. Blue Cross & Blue Shield of Alabama, Inc.*, 890 F.2d 1137, 1140 (11th Cir. 1989).

In response, Grubbs argues that a heightened arbitrary and capricious standard of review applies. This heightened standard applies when a conflict of interest exists. *See Brown*, 898 F.2d at 1567. Grubbs argues that since Prudential pays out to beneficiaries from its own assets, there is a conflict of interest between its role as a fiduciary and its profit making role.

### II. The Merits

Prudential argues that there was a reasonable basis for its decision to discontinue Grubbs' benefits, and thus under *Brown* and *Lee*, it is entitled to summary judgment. It notes that in early

2001, it received a questionnaire from Grubbs indicating that his social activities might be inconsistent with his claimed disability. Later, Prudential received evaluations from Grubbs' doctors which indicated that he would be able to perform some type of sedentary work. Then, Prudential sent Grubbs' file for an independent review, which concluded that Grubbs could do some sedentary work, and even identified several jobs that Grubbs could perform.

Also, Prudential notes, it has given Grubbs many opportunities to submit additional, objective evidence to substantiate his claim. While Grubbs did submit additional material from his doctors, Prudential notes that neither doctor offered objective evidence that would support Grubbs' claim, instead offering only unsubstantiated opinions.[5] Grubbs has simply offered no evidence that would suggest that he is incapable of performing "any job for which [he is] reasonably fitted by education, training, and experience." *See* Def. Ex. E at 326-37 (discussion of coverage under the Plan).

In response, Grubbs argues that Prudential had no reasonable basis for terminating his benefits under the Plan. To support his position, Grubbs lists the rapid chain of events that led to the termination of his benefits. Grubbs notes that Prudential immediately began contacting his doctors after it received his Activities of Daily Living Questionnaire.[6] Prudential then referred the file to Dr. Genovese on the same day it received Dr. Stanley's assessment.

Next, Dr. Genovese, one day later and without examining or speaking to Grubbs, issued

---

[5] Prudential also cites deposition testimony from Grubbs' doctors to the effect that they were not qualified to make some of the assessments that were implied in their opinions. However, as Prudential itself notes, "a district court should limit its review in such cases to consideration of the material available to [the administrator] at the time it made its decision." *Jett*, 890 F.2d at 1140. It is unclear to the court whether the administrative appeals process was closed at the time these depositions were taken, although Prudential seems to argue that this court can consider the deposition testimony. *See* Def. Reply Br. at 10.

[6] Grubbs also points out that none of these doctors indicated that he could perform significant amounts of physical activity, and Dr. Stanley specifically stated that Grubbs remained "limited."

her conclusion that Grubbs could perform some light work. Grubbs argues that Dr. Genovese's assessment was based primarily on Dr. Stanley's cardiac assessment, and not on the substantial amount of documentation that Grubbs provided in connection with his various medical conditions.[7] Thereafter, Prudential immediately engaged Ms. Carli to prepare a vocational assessment, specifically directing her to the evaluations made by Grubbs' doctors. Grubbs argues that this effectively limited Ms. Carli's review of his file, and suggests that she did not review any of the documentation that Grubbs provided in connection with his various medical conditions. Grubbs also notes that Ms. Carli issued her report[8] without interviewing, observing, or examining him, and argues that the jobs listed by Ms. Carli were well beyond his education, training, or experience level.[9]

Grubbs also points to the large amount of documentation, submitted to Prudential during the period that it was paying benefits, that supported his claim of total disability. Specifically, he points to a February 1998 statement from Dr. Watkins which concluded that there were no work duties that Grubbs could perform. *See* Pl. Ex. 2 at 111-12. In essence, Grubbs is arguing that Prudential ignored years of documentation when it decided to submit his file to Dr. Genovese and Ms. Cali.

Finally, Grubbs argues that Prudential has ignored the evidence he submitted during the appeals process, specifically the June 26, 2001 letter of Dr. Watkins, and the April 3, 2001

---

[7]Grubbs also notes the large number of referrals handled by Dr. Genovese and Ms. Carli. *See* Pl. Ex. 3.

[8]There is some dispute as to what exactly Ms. Carli relied upon in making her assessment. *Compare* Pl. Br. at 8 n.5, *with* Def. Reply Br. at 4 n.3.

[9]Grubbs also refers to Dr. Stanley's deposition, in which he stated that Grubbs could not perform the listed jobs or even complete the interview process. *See* Pl. Ex. 4 at 44, 48, 60, 67-70, 79-81, 83.

affidavit of Dr. Stanley. Grubbs notes that Dr. Stanley, in his deposition, stood by the conclusions he made in that affidavit. *See* Pl. Ex. 4 at 84. Grubbs argues that any consideration given by Prudential to this additional information was superficial at best, and that it was simply looking for a way to terminate his benefits.[10]

In reply, Prudential again argues that the only decision before this court is whether there was a "reasonable basis' for the decision, "based on the facts as known to [Prudential] at the time the decision was made." *Brown*, 898 F.2d at 1559. Prudential also notes that the Plan gave it the right to review Grubbs's status periodically. *See* Def. Ex. E at 327. Thus, there was nothing sinister about sending Grubbs the Activities of Daily Living Questionnaire. Also, there was nothing suspect about seeking additional information about Grubbs from his doctors, given that he reported he could perform physical activities such as golfing and fishing. Prudential further argues that Dr. Genovese and Ms. Carli simply reached the same conclusions reached by Grubbs's doctors in the Physical Capacities Evaluations.

Prudential also points to the deposition testimony of Dr. Stanley and Dr. Watkins. Dr. Stanley testified that "from a cardiac standpoint, and a vascular standpoint, [Grubbs] could" handle a job. *See* Def. Ex. C at 22. Dr. Watkins testified that Grubbs "should be able to withstand, from a cardiac standpoint, a sedentary job." *See* Def. Ex. B at 31-32. As for Grubbs' cognitive problems, both doctors testified that they have never performed any tests on Grubbs, and that they were not qualified to make a cognitive assessment. *See* Def. Ex. B at 16-18, 90-91; Ex. C at 28-29, 90-91. Prudential also notes that Grubbs himself admitted that he has never seen a professional about his cognitive problems. *See* Def. Ex. D at 75-76. Prudential argues that

---

[10]Grubbs also argues that his file should have been referred to a psychologist or other person with psychiatric training, to review his ability to work in light of his mental conditions. *See* Pl. Ex. 1 at § 1.24.

Grubbs has simply failed to present any objective evidence to support his position.

## CONCLUSIONS OF THE COURT

In view of the closeness of the factual issues, and particularly in view of the conflict of interest of the defendant, the court will deny the Motion.[11] There seems to be an issue relating to Grubbs' mental status which was not adequately considered, either because it was not adequately presented, or because it was ignored. If either party requests and agrees to pay the expense of a psychiatric or psychological evaluation, the court will order a "remand" to the reviewer to consider such evidence. Any such evaluator should be totally independent and not previously retained by either Party as to any case. It would appear that, under Eleventh Circuit case law, the court will otherwise be restricted to considering only the evidence that was before Prudential at the time it made its decision. *See Jett, supra.* The court also notes that there may be an issue as to whether Dr. Genovese or Ms. Carli have a conflict of interest.

This _10th_ day of January, 2003.

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE

---

[11] It is unclear whether the Social Security decision was provided to Prudential. If it was, the decision, while not decisive, is persuasive.