FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

03 OCT 23 PM 1:48

U.S. DISTRICT COURT
N.D. OF ALABAMA

JOHNNY M. GRUBBS,        )
                                 )
      Plaintiff,         )
                                 )
v.                              )     Civil Action No.: 01-PT-2505-E
                                 )
THE PRUDENTIAL INSURANCE    )
COMPANY OF AMERICA,       )
                               )
      Defendant.        )

ENTERED

OCT 23 2003

## MEMORANDUM OPINION

This cause comes on to be heard upon Defendant Prudential Insurance Company of America's ("Prudential") Renewed Motion for Summary Judgment, filed on September 17, 2003.

## FACTS[1] AND PROCEDURAL HISTORY

Grubbs was employed with Morrison Knudsen Corporation ("Knudsen") as a Compliance Director/Quality Manager. *See* Def. Ex. A at 314. He was covered under Knudsen's Long Term Disability Plan ("the Plan") and an insurance policy. *See* Pl. Ex. 1; Def. Ex. E.[2] That policy was with Prudential. Grubbs has a history of severe coronary artery disease, having had two coronary bypass surgeries in 1987 and 1994. *See* Def. Ex. A at 314; Pl. Ex. 2 at

---

[1] In support of its renewed motion for summary judgment, Prudential re-submits its August 22, 2002 summary judgment brief and exhibits. On January 13, 2003, this court issued a memorandum opinion and order denying defendant's August 22, 2002 summary judgment motion.

This memorandum opinion fully incorporates the fact and argument sections of the court's January 13, 2003 memorandum opinion and addresses facts and arguments newly raised by the parties.

[2] The court notes that the Parties have submitted two different versions of the Plan. Grubbs argues that he is submitting the same document that Prudential submitted with its Motion to Dismiss. While the two documents are different, they are also similar, and neither side has taken issue with portions of the Plan cited by the other.



27, 38, 69, 173-76.  In January 1996, Grubbs stopped working for Knudsen, claiming physical

impairment due to his condition.  *See* Def. Ex. A at 314.  He then filed an application for long

term disability benefits under the Plan.  *Id.*  The following are pertinent sections of the Plan:

Section 3.1: Monthly Benefit Payment:

A Monthly Benefit will be paid to a Participant who:

(a) becomes Totally Disabled while covered under the Plan;
(b) is Totally Disabled throughout the Elimination Period;
(c) remains Disabled beyond the Elimination Period; and
(d) submits proof of loss satisfactory to the Claims Administrator

Section 1.32: Totally Disabled

An Employee prevented by a Sickness or Injury from engaging in every duty
pertaining to the Employee's occupation for profit during the Elimination Period
and for the next six Months.  After that, and for as long as he stays Totally
Disabled, the Employee must be prevented by the disability from doing any
occupation or work for pay, profit, or gain for which he is or could be qualified
by:

(a) training;
(b) education; or
(c) experience.

However, Rehabilitative Employment will not be considered an occupation or
work for profit for the purposes of this definition of Totally Disabled.

Section 1.16: Definition of Injury

Injury to the body of a Participant.

Section 1.31: Definition of Sickness

A disorder of the body or mind of a Participant.

Section 1.24: Definition of Physician

Any legally qualified physician.  However, if Total Disability is due to mental,
psychoneurotic, or personality disorder, the Physician also must be qualified to

2

evaluate and treat mental illness through specialization and experience in psychiatric medicine.

*See* Pl. Ex. 1.[3]

On February 27, 1996, Grubbs received a letter informing him that he would begin receiving long term disability benefits beginning April 15, 1996. *Id.* at 274-76; Pl. Ex. 2 at 115, 148-53, 176. Grubbs received long term disability benefits uninterrupted for the next several years. His status was reviewed periodically, but his condition remained relatively unchanged.[4]

On or about January 2, 2001, Grubbs completed, at Prudential's request, an Activities of Daily Living Questionnaire. *See* Def. Ex. A at 223-30; Pl. Ex. 2 at 102-09. Grubbs reported that he was still experiencing various physical and cognitive problems; however, he also reported

---

[3]The document provided by Prudential is not organized in this way and does not contain some of these provisions.

In opposition to Prudential's renewed motion for summary judgment, Grubbs relies upon text from a version of the Prudential Long Term Disability Policy submitted by Prudential:

**HOW THE PLAN WORKS**

If you become totally disabled by injury or illness while covered, you may be eligible to receive monthly LTD benefits during the first 12 months of continuing disability. **"Totally disabled"** or **"total disability"** means you are unable to work at your own occupation, because of illness or injury. After the first 12 months of continuing disability, "totally disabled" means you are unable to work at any job for which you are reasonably fitted by education, training, and experience because of illness or injury. If a medical examination is required, it will be paid for by Morrison Knudsen. Working in an approved rehabilitation program does not constitute a "reasonable occupation." An approved rehabilitation program is:

– A formal or informal vocational rehabilitation (or work training) program
         or
– A period of part-time work for purposes of rehabilitation, which Prudential approved in writing.

The rehabilitation program begins when Prudential gives its approval and ends when Prudential withdraws approval.

*See* Def. Ex. E, p. 0326-27. (Emphasis added by Grubbs).

[4]On or about February 1997, the Social Security Administration found Grubbs to be disabled pursuant to 20 C.F.R. § 404.1520(f). Among other things, the Social Security Administration found that "the claimant's impairments . . . prevent him from performing even sedentary work." *See* Pl. Opp., Ex. 2.

being able to engage in certain social and/or physical activities, such as golfing, fishing, shopping, traveling, and reading to grandchildren. *See* Def. Ex. A at 226-28; Pl. Ex. 2 at 103-06. After receiving this information, Prudential began contacting Grubbs's doctors. *See* Pl. Ex. 2 at 21, 24, 35, 41-43, 46, 60-61, 93-95, 97-99. Prudential gathered information from several doctors about Grubbs's various medical conditions. *See* Pl. Br. at 4-5; Pl. Ex. 2 at 27, 49-54, 26-34, 38-39, 56-57, 73-90. Several of these documents referred to Grubbs as "disabled" or as suffering from "dementia." *See, e.g.*, Pl. Ex. 2 at 27, 49-54.

Three documents are worth discussing specifically. On or about January 13, 2001, Dr. John Watkins, Grubbs's internist, completed a Physical Capacities Evaluation. *See* Def. Ex. A at 143-44; Pl. Ex. 2 at 49-50. Dr. Watkins indicated that Grubbs could "occasionally" perform activities such as stooping, reaching above his shoulders, reaching forward more than eighteen inches, and driving automotive equipment. Dr. Watkins also stated that Grubbs could do some standing, walking, and lifting. Finally, Dr. Watkins stated that Grubbs's conditions would not affect his ability to do certain activities, such as reaching forward less than eighteen inches, operating foot controls, and handling/grasping objects. On February 19, 2001, Dr. Steven Nichols, Grubbs's orthopedic surgeon, also completed a Physical Capacities Evaluation. *See* Def. Ex. A at 150-51; Pl. Ex. 2 at 56-57. Dr. Nichols's statements were similar to Dr. Watkins's, although Dr. Nichols did indicate that Grubbs could perform more activities for longer periods of time.

On April 3, 2001, Dr. Alfred Stanley, Jr., Grubbs's cardiologist, completed a Cardiac Functional Capacity Assessment form. *See* Def. Ex. A at 88; Pl. Ex. 2 at 20. Dr. Stanley stated that Grubbs has an American Heart Association Cardiac Classification of Class III (out of four),

4

and indicated that Grubbs could perform at a "light" physical demand level. Dr. Stanley also listed some of Grubbs's more serious medical conditions, and stated that Grubbs "remains limited."

Based on this documentation, Prudential referred Grubbs's file to Dr. Elizabeth Genovese for a medical consultant review and to Karen Carli for a formal vocational analysis. *See* Def. Ex. A at 80, 86; Pl. Ex. 2 at 19. Dr. Genovese concluded, after reviewing Grubbs's records (including the assessment from Dr. Stanley), that Grubbs was capable of sedentary work. *See* Def. Ex. A at 83-85; Pl. Ex. 2 at 16-18. However, Dr. Genovese's assessment was apparently based upon Grubbs's physical capacities only. *See* Pl. Ex. 7 at 28, 63-65. Ms. Carli also concluded that Grubbs had the capacity to perform work activities at the sedentary to light exertion level, and she identified three alternative positions for which he was qualified. *See* Def. Ex. A at 76-79.[5] In its request for an assessment, Prudential specifically directed Ms. Carli to examine the three Physical Capacity Evaluations completed by Grubbs's doctors and Dr. Genovese's report. *See* Def. Ex. A at 80. Ms. Carli never examined or interviewed Grubbs. *See* Pl. Ex. 6 at 8-9.

Based on these analyses, Prudential determined that Grubbs no longer met the definition of "total disability" under the Plan. In a termination letter from Prudential Claims Consultant Yvonne Blackwell dated May 16, 2001, Prudential informed Grubbs that his benefits would be terminated effective May 31, 2001. *See* Def. Ex. A at 64-68; Pl. Ex. 2 at 5-10. The May 16th letter stated: "In order to determine [Grubbs's] restrictions, limitations and severity of impairments [Prudential] had [Grubbs's] file reviewed by [Prudential's] physician consultant on

---

[5]Those positions were "Budget Officer," "Controller," and "Director, Records Management."

April 4, 2001.  In reviewing the records the physician consultant concluded that even though [Grubbs was] limited, [Grubbs] could probably do light work, primarily seated." *See* Pl. Opp., Ex. 1.

Prudential's May 16, 2001 termination letter also stated: "Based upon [plaintiff's] transferable skills, a vocational assessment was performed which identified a sampling of occupations for which [plaintiff is] qualified and which are commensurate with [his] ability to engage in gainful employment." These identified positions were: (1) Budget Officer (wage estimate $22.85 per hour); (2) Controller (wage estimate $21.58 per hour); and (3) Director of Records Management (wage estimate $27.07 per hour).[6]  Furthermore, the May 16, 2001 termination letter set out an overview of Grubbs's medical information upon which the decision to terminate benefits was based.[7]

---

[6] Grubbs observes that the termination letter itself did not explain what these "transferable skills" were or how Grubbs was "reasonably fitted by education, training, or experience" to take on the listed positions. Furthermore, Grubbs argues, Prudential's record revealed plaintiff had no past "education, training, or experience" in any of these occupations. Also, Dr. Carli never tested or interviewed Grubbs prior to determining his capacity to perform in these positions.

[7] Grubbs relies upon the entire overview and highlights information relating to Grubbs's cognitive and psychological disorders. The court has considered the overview in its entirety but only provides the following excerpt here:

**Overview of Medical Information:**

Our assessment evaluated medical records provided by Dr. John Acker (Cardiologist), Dr. Roger Moraski (Cardiologist), Dr. Steven Nichols (Orthopedic Surgery), Dr. John Watkins (Internal Medicine), Dr. William Harvey (Vascular Surgeon), Dr. Alfred Stanley (Cardiologist) and a medical consultant file review.
In the attending physician's statement dated January 1996 Dr. John Acker (cardiologist) listed your diagnosis as severe coronary artery disease with symptom of angina.  Objective findings were PET scan that revealed ischemia.  Dr. Acker reported that you were under his care with coronary bypass grafting for the second time.  You had recurrence of angina with anything other than mild activity. Dr. Roger Moraski (cardiologist) reported in November 1996 that your medications were changed. You were started on norvasc and ISMO was discontinued and you also began imdur.
In the attending physician's statement dated December 1996 Dr. John Watkins (internal medicine) reported diagnoses of coronary artery disease **with mild dementia.  Your symptoms were chest pain, memory loss, and emotional lability.  Medications listed were lopressor, mevacor, norvasc,**

As of May 16, 2001, Grubbs alleges, Prudential knew that on February 15, 1997, the

Social Security Administration had determined Grubbs to be totally disabled. *See* Pl. Opp., Ex.

3. In fact, Grubbs asserts, on March 20, 1997, Prudential wrote Grubbs and advised him that

they were assisting him in pursuing Social Security Disability ("SSD") benefits, that Grubbs

would likely receive a considerable overpayment, and that Grubbs would need to repay most or

all of the retroactive Social Security benefits received. *Id.* Upon successfully obtaining his

retroactive SSD benefits, Grubbs alleges, he refunded $12,870 in overpayments to Morrison

Knudsen as directed by Prudential's May 9, 1997 letter. *Id.* Receipt of Grubbs's refund check

(dated May 10, 1997) was acknowledged by Morrison Knudsen on June 2, 1997. *Id.*

On or about June 29, 2001, Grubbs sent a letter to Prudential requesting an appeal of the

May 16, 2001 decision to discontinue benefits. *See* Def. Ex A at 58. Grubbs stated in the letter

that he was not able, physically or mentally, to return to work, due to his medical conditions. On

July 27, 2001, Grubbs submitted additional information to substantiate his claim of total

disability. Grubbs submitted a letter from Dr. Watkins stating, among other things, that Grubbs

"would find functioning in a work-related environment very difficult." *See* Def. Ex A at 57; Pl.

Ex. 2 at 181. Grubbs also submitted an affidavit from Dr. Stanley, who concluded that Grubbs

was not capable or working, stating that "to the extent I may have indicated he was capable of

resuming any form of gainful employment, such communication was in error considering the

---

**bayer, and effexor.** Dr. Watkins reported in February 1998 that there had been no changes in your condition. No improvements were expected. **Your activities were minimal and you were withdrawn and experienced memory loss.**

. . . .

In order to determine your restrictions, limitations and severity of impairments we had your file reviewed by our physician consultant on April 4, 2001. In reviewing the records the consultant concluded that even though you are limited, you could **probably** do light work, primarily seated. (Emphasis added by Grubbs).

facts pertaining to his total medical picture." *See* Def. Ex. A at 56; Pl. Ex. 2 at 179.  He noted

that "[i]t is my opinion that when all conditions are considered . . . [Grubbs] is clearly not able to

sustain any type of employment."  More specifically, Dr. Stanley stated that Grubbs "is not

capable of undertaking and successfully engaging in any of the jobs identified" by Prudential.

In response, Prudential contacted Grubbs's counsel on August 28, 2001, leaving a

message requesting objective evidence of Grubbs's continued disability. *See* Def. Ex. A at 51.

After no documentation was provided, Prudential, on September 6, 2001, sent a letter to

Grubbs's counsel also requesting objective evidence, and giving twenty-one (21) days for

Grubbs or his counsel to respond. *Id.* at 49.  No additional documentation was ever provided.

On September 27, 2001, Dr. Bernard Stevens conducted a second review of Grubbs's medical

information for Prudential.  Dr. Stevens concluded that Grubbs was capable of performing

sedentary work, provided that certain constraints were imposed. *Id.* at 44-46.  On October 1, Ms.

Carli completed a second vocational assessment, and concluded that Dr. Stevens'

recommendations were compatible with the alternate occupations she listed in her first

assessment. *Id.* at 42.

On October 4, 2001, Grubbs filed a complaint alleging bad faith, breach of contract, and

seeking a declaratory judgment and specific performance.  Grubbs later, by court order, amended

his Complaint, dropping the state law claims and bringing his lawsuit as an ERISA cause of

action. *See* Am. Compl. at 1.  Grubbs seeks recovery of past and future benefits, attorney's fees,

and any other legal and equitable relief due to him.

Since this lawsuit was filed, Prudential has deposed Grubbs's doctors.  Both Dr. Watkins

and Dr. Stanley stated that Grubbs is capable of performing sedentary work, at least from a

8

cardiac standpoint. *See* Def. Ex. B at 31-32 (Watkins); Def. Ex. C at 22, 85 (Stanley). Both

doctors stated that Grubbs may have certain cognitive problems as a result of his condition, but

both admitted that they did not perform any psychological, neurological, or other tests on

Grubbs, and that they are not qualified to make a cognitive or psychological assessment. *See*

Def. Ex. B at 16-18; Def. Ex. C at 28, 43, 45-46, 88. Grubbs admits that he has never seen a

psychologist, psychiatrist, or psychological therapist. *See* Def. Ex. D at 75-76.[8]

On January 10, 2003, this court denied Prudential's previous motion for summary

judgment, stating:

> In view of the closeness of the factual issues, and particularly in view of the
> conflict of interest of the defendant, the court will deny the Motion. There
> seems to be an issue relating to Grubbs' mental status which was not adequately
> considered, either because it was not adequately presented, or because it was
> ignored. If either party requests and agrees to pay the expense of a psychiatric
> or psychological evaluation, the court will order a "remand" to the reviewer
> to consider such evidence. Any such evaluator should be totally independent
> and not previously retained by either Party as to any case. It would appear that,
> under Eleventh Circuit case law, the court will otherwise be restricted to
> considering only the evidence that was before Prudential at the time it made
> its decision. *See Jett, supra.* The court also notes that there may be an issue
> as to whether Dr. Genovese or Ms. Carli have a conflict of interest.[9]

On February 21, 2003, the court granted Prudential's motion to have plaintiff submit to a

neutral neuropsychological evaluation and also remanded the cause to Prudential for further

administrative consideration. The parties agreed to the selection of an impartial physician (Dr.

Thomas Novack), who conducted a neuropsychological evaluation of Grubbs. The summary of

---

[8] However, as discussed later in this memorandum opinion, Grubbs did meet with Dr. Thomas A. Novack, neuropsychologist, on March 31, 2003.

[9] Furthermore, the January 10, 2003 memorandum opinion stated: "It is unclear whether the Social Security decision was provided to Prudential. If it was, the decision, while not decisive, is persuasive." In opposition to Prudential's renewed summary judgment, Grubbs now provides evidence demonstrating Prudential's knowledge of the Social Security decision in 1997.

Dr. Novack's March 31, 2003 Neuropsychological Testing Report reads:

SUMMARY: Mr. Grubbs is a 57-year-old male who has been receiving long term disability benefits since 1996 in relation to severe vascular disease. He has reported significant cognitive limitations, such as with respect to memory abilities and concentration skills, that contribute to his disabled status . . . . The neuropsychological evaluation indicates that there are no significant sensory or motor limitations with respect to upper extremity functioning. Mr. Grubbs performs well with regard to concentration skills as objectively assessed and his speed of processing is intact. There are no significant language difficulties. Mr. Grubbs is capable of following instructions and can express himself adequately. Mr. Grubbs performs well overall with respect to spatial and constructional abilities and his reasoning skills are very good. Intellectually he is functioning within the average range, which also characterizes his academic abilities. Mr. Grubbs performs well with respect to recall of visual information, such as pictured scenes, but he exhibits mild difficulties with respect to recall of verbal information. His learning of verbal information is mildly slow compared to others his age and his subsequent recall is inconsistent. This is definitely an area of weakness for Mr. Grubbs, particularly in comparison to his skills in other areas, even though for the most part his is still functioning within the average range. Mr. Grubbs also exhibits signs of depression of mild degree. The pattern of results does not suggest significant disruption of cerebral functioning, at least that can be assessed objectively. Mr. Grubbs and his wife, however, appear to be convinced of his cognitive difficulties and it appears that he has assumed somewhat of a helpless stance in terms of his daily functioning. Strictly from the perspective of his cognitive abilities Mr. Grubbs has the capability of seeking and maintaining employment. Compensation for his memory difficulty is possible. He will likely require a longer period of training than the average employee due to this weakness in learning and recalling new information. Being placed in a position of having to seek employment, however, after seven years of disability will likely generate a great deal of anxiety for him. That in itself could be detrimental to his return to work. The assistance of Vocational Rehabilitation Services would be logical in this case and to maximize the chances that Mr. Grubbs will be successful in seeking employment.[10]

-----

[10] Grubbs also relies upon later sections of Dr. Novack's report:

**Mr. Grubbs exhibited variable performance with regard to memory abilities**. When asked to recall verbal information in a story format **his immediate and delayed recall fell within the borderline deficient to low average range for his age. His recall of the information was sequential but sparse overall.** It was encouraging that when one of the stories was repeated to him he was able to substantially increase his memory for the story. Following a half hour delay he required prompting to initiate recall of one of the stories but not for the other story. He exhibited much better recall of the story that had been repeated to him. On a more challenging memory task, the CVLT-2, **Mr. Grubbs performed within the low average range compared to others his age. His pace of learning across the five trials was below expectation.**

Grubbs requested and was granted permission to obtain a vocational evaluation from

Vocational Specialist Joseph M. Miller, who met with Grubbs and evaluated Grubbs's medical,

psychological, and other existing information.  On June 3[11] and August 20, 2003, Mr. Miller

reported that Grubbs cannot return to work, does not possess transferable skills such as those

---

**He was able to achieve recall of eight items after the fifth learning trial**.  He did
not employ memory strategies to assist in his learning as much as the average
person.  **Following presentation of interference material he was able to recall five
items, which also falls within the low average range**.  However, that increased to
eight items when he was provided with a semantic cueing. *(sic)*.  **After a half-hour delay
his recall was seven items, which also falls within the low average range.
Mr. Grubbs had U difficulty with errors in his recall to a greater extent than the
average person.  The results suggest that Mr. Grubbs will likely be slow in learning new verbal
information and his subsequent recall may be somewhat sporadic, but benefitted by cueing** *(sic)*.  Mr.
Grubbs overall performed better with regard to recall of visual information.  When asked to recall pictured
scenes his remembrance fell within the average range immediately after presentation of the material and
following a half hour delay.  **This is despite not being able to recall anything from one of the four
scenes presented.**  He was also able to recall the R-O figure adequately, obtaining scores
in the average range. (Emphasis added by Grubbs).

[11] Mr. Miller's June 3, 2003 Vocational Rehabilitation Evaluation concluded:

Mr. Grubbs presents with significant medical problems.  While he does have 3 years of college,
he states that he has virtually no computer experience applicable to the job market.  Further, it
appears that in addition to his specific functional limitations, ranging from light down to
sedentary physical demand, he has considerable exertional restrictions with regard to climbing,
crawling, reaching, and working in high places.  Mr. Grubbs also stated that he finds it necessary
to lie down during the day, is bothered by fumes and high temperatures, and tires extremely
easily, and though he may have a good day where he can be more active, he may find himself
extremely fatigued the next two or three days following over-exertion.  It would not appear that
Mr. Grubbs can perform past relevant work experience for previous occupations and although
he does possess some significant skills, it would not appear that he can apply these skills in other
occupations.  Further, for jobs more sedentary to light in nature, he is in an extreme disadvantage
by lack of computer training, and other business related skills.  Mr. Grubbs is also classified
as an older worker, being 57 years of age.  In sum, it is not felt that Mr. Grubbs is employable
in the local, regional, or national economy due to combinations of lack of transferable skills,
physical restrictions and difficulties, age, some difficulties with respect to memory identified by
Dr. Novack, and Mr. Grubbs' self report of mood swings.  Mr. Grubbs stated he does not feel
he could work an uninterrupted schedule as he is so prone to fatigue and finds it so necessary to
lie down during the day.  Considering all material reviewed and based upon interviews with
Mr. Grubbs, it is not felt that he is a candidate for rehabilitation or training.  His limitations and
age would in all probability mitigate against a successful rehabilitation outcome.  In sum, it is
this specialist's opinion that Mr. Grubbs is totally disabled from any occupations as a result
of his medical problems, and neither is he a candidate for vocational rehabilitation.

*See* Pl. Opp., Ex. 5.

11

outlined by Prudential's August 4, 2003 assessment letter, and is not a candidate for vocational rehabilitation.[12]

In a June 6, 2003 conference call, the court confirmed that it had remanded the matter to Prudential to make another administrative determination regarding plaintiff's claim for disability benefits. By letter dated August 4, 2003, Prudential confirmed its completion of further administrative review and upheld its previous decision to terminate Grubbs's disability benefits. Prudential explained that it had reviewed all previous materials as well as Dr. Novack's neuropsychological evaluation, Mr. Miller's Vocational Rehabilitation Evaluation, and an additional in-house vocational evaluation (by Patricia Sasona) which confirmed plaintiff's employability within the medical limits and restrictions outlined in the file. Prudential's latest letter identified the following "gainful occupations which Mr. Grubbs could be expected to perform": order supervisor, administrative assistant, and cost estimator. In addition, the August 4, 2003 denial letter offered to pay for plaintiff's vocational assistance. Prudential asserts that

---

[12] Mr. Miller's August 20, 2003 letter to Mr. Gaiser (Grubbs's attorney) further stated:

> Occupations outline in Ms. Murray's letter to you of August 4, 2003 included cost estimator, administrative assistant and order supervisor. It should be pointed out that Mr. Grubbs does not possess any computer skills and certainly the occupations outlined in Ms. Murray's communication to you require an ability to perform computer functions as well as better than a borderline deficient to low average range for immediate verbal information recall. Additionally, Mr. Grubbs does find that his medications make him drowsy and, consequentially, he finds it necessary to lie down during the day periodically because of extreme tiredness.

> In sum, Mr. Grubbs cannot return to past relevant work experience and lacks transferable skills to other occupations, including those outlined in Ms. Murray's communication to you, which include lack of computer training and business related skills. Mr. Grubbs is also an older worker, 57 years of age, has exertional restrictions, and is not a candidate for rehabilitation due to age, physical issues and cognitive difficulties as outlined by Dr. Novack.

*See* Pl. Opp., Ex. 5.

such offer was not required by the plan.

On September 4, 2003, Grubbs filed a "Reply to Defendant's Continued Denial of Benefits and Request for Trial Setting, " which noted Prudential's second denial of benefits. *See* Ex. A. Grubbs submitted the comments of his expert vocational consultant, Mr. Miller, regarding Prudential's August 4th letter. *See* Ex. B.[13] According to plaintiff, Prudential "has finally acknowledged Plaintiff's need for vocational rehabilitation without explanation in its denial letter of why this important contract benefit has been heretofore ignored." *Id.* Plaintiff sought a full trial of the issues, including any conflicts of interest created by an insurer paying claims from its own funds. Grubbs noted his continued qualification for social security disability payments under the same set of facts as those originally submitted to defendant in 1997 and further stated: "Defendant is knowledgeable of this fact in that it arranged for an independent firm to obtain Plaintiff's disability benefits in order to permit it to offset the amount of SSI disability payments from its benefit payments."

In reply to plaintiff's motion for new trial setting, Prudential observed the case's procedural history and confirmed its August 4, 2003 denial of long-term disability benefits to Grubbs. Prudential further confirmed that it had reviewed all extant medical evaluations of Grubbs, including Dr. Novack's neuropsychological and Mr. Miller's vocational evaluations,[14] and also commissioned an additional in-house vocational evaluation by Sasona which "confirmed plaintiff's employability within the medical restrictions and limitations outlined in

---

[13] Upon examining Prudential's latest denial of benefits, Mr. Miller has noted that this denial is still predicated upon plaintiff being employable in jobs for which plaintiff has no past relevant work experience or transferable skill set. *Id.*

[14] Defendant criticized Mr. Miller's vocational rehabilitation evaluation as "entirely inconsistent with all objective medical evidence in the file, including Dr. Novack's recent evaluation."

the file."

According to Prudential, Grubbs still fails to present objective medical evidence of total disability. Both Grubbs's cardiologist and treating physician, Prudential argues, have unequivocally testified that Grubbs is not totally disabled from a cardiac standpoint. Regarding Grubbs's cognitive status as the basis of any claim for total disability, defendant contends, Dr. Thomas Novack's March 3, 2003 neuropsychological evaluation concluded that plaintiff was not totally disabled from a cognitive standpoint. Countering Grubbs's suggestion that Prudential's denial of benefits is predicated on Grubbs being employable in jobs for which he has no work experience, Prudential argues that its denial was based entirely on the lack of medical evidence that Grubbs is cognitively disabled. Addressing Grubbs's statement that Prudential has acknowledged Grubbs's need for vocational rehabilitation while previously denying this "contract benefit," Prudential contends, the applicable plan contains no contractual rehabilitation benefit, and Prudential "simply offered vocational assistance to plaintiff as a gesture of good will and with no strings attached."

Prudential's reply to Grubbs's motion for trial Setting concluded with its belief that the case should be handled by summary disposition, as "plaintiff has not and cannot present any objective medical evidence supporting his claim that he is cognitively disabled." Thus, Prudential contemporaneously filed this renewed motion for summary judgment. On October 7, 2003, this court set the case for trial on January 5, 2004. On October 10, 2003, this court granted plaintiff's motion to reschedule the trial date until after February 1, 2004. This court now considers Prudential's renewed motion for summary judgment.

14

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party moving for summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477 U.S. at 323.  "It is never enough [for the movant] simply to state that the non-moving party could not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted).  The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial. *Celotex*, 477 U.S. at 324.  The non-moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted). Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay,* 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer*, 265 F.3d at 1192.  Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999).  Finally, the trial court must resolve all reasonable doubts in favor of the

non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

**ARGUMENTS**[15]

### I. Standard of Review

Prudential notes that the Plan gives it discretionary authority to interpret the provisions of the plan. *See* Def. Ex. E at 317. Under Eleventh Circuit law, Prudential argues, when a plan grants the decision-maker discretionary authority, a court must review any plan decisions under the arbitrary and capricious or abuse of discretion standard. *See Brown v. Blue Cross & Blue Shield of Alabama, Inc.*, 898 F.2d 1556 (11th Cir. 1990). Accordingly, the only issue in this case is whether "there was a reasonable basis for the decision to deny benefits, based on the facts as known to the fiduciary at the time the decision was made." *Brown*, 898 F.2d at 1559; *see also Lee v. Blue Cross & Blue Shield of Alabama, Inc.*, 10 F.3d 1547, 1549 (11th Cir. 1994). Thus, "a district court should limit its review in such cases to consideration of the material available to [the administrator] at the time it made its decision." *Jett v. Blue Cross & Blue Shield of Alabama, Inc.*, 890 F.2d 1137, 1140 (11th Cir. 1989).

In response, Grubbs argues, a heightened arbitrary and capricious standard of review applies because a conflict of interest exists. *See Brown*, 898 F.2d at 1567. Grubbs argues that since Prudential, the plan administrator, has discretionary authority to interpret the provisions of the disability plan and also pays out to beneficiaries from its own assets, there is a conflict of interest between its role as a fiduciary and its profit making role. Additionally, Grubbs contends,

---

[15] As noted above, in light of defendant's re-submission of its August 22, 2002 summary judgment motion and brief, this memorandum opinion fully incorporates the fact and argument sections of the court's January 13, 2003 memorandum opinion while addressing new facts and issues raised by the parties.

16

"Prudential has previously demonstrated its self-interest by assisting Grubbs in pursuing and receiving Social Security Disability benefits, after which, Defendant Prudential received full reimbursement for overpayment benefits in the amount of $12, 870." *See* Pl. Opp., Ex. 3.

## II. The Merits

### A.    Prudential's motion

Prudential argues that there was a reasonable basis for its decision to discontinue Grubbs's benefits, and thus under *Brown* and *Lee*, it is entitled to summary judgment. It notes that in early 2001, it received a questionnaire from Grubbs indicating that his social activities might be inconsistent with his claimed disability. Later, Prudential received evaluations from Grubbs's doctors which indicated that he would be able to perform some type of sedentary work. Then, Prudential sent Grubbs's file for an independent review, which concluded that Grubbs could do some sedentary work, and even identified several jobs that Grubbs could perform.

Also, Prudential notes, it has given Grubbs many opportunities to submit additional, objective evidence to substantiate his claim. While Grubbs did submit additional material from his doctors, Prudential notes, neither doctor offered objective evidence that would support Grubbs's claim, instead offering only unsubstantiated opinions.[16] According to Prudential, Grubbs has offered no evidence that would suggest that he is incapable of performing "any job for which [he is] reasonably fitted by education, training, and experience." *See* Def. Ex. E at 326-37 (discussion of coverage under the Plan).

-----

[16]Prudential also cites deposition testimony from Grubbs's doctors to the effect that they were not qualified to make some of the assessments that were implied in their opinions. However, as Prudential itself notes, "a district court should limit its review in such cases to consideration of the material available to [the administrator] at the time it made its decision." *Jett*, 890 F.2d at 1140. It is unclear to the court whether the administrative appeals process was closed at the time these depositions were taken, although Prudential seems to argue that this court can consider the deposition testimony. *See* Def. Reply Br. at 10.

### B.    Grubbs's response

In response, Grubbs argues, Prudential had no reasonable basis for terminating his benefits under the Plan.  To support his position, Grubbs lists the rapid chain of events that led to the termination of his benefits.  Grubbs notes that Prudential immediately began contacting his doctors after it received his Activities of Daily Living Questionnaire.[17]  Prudential then referred the file to Dr. Genovese on the same day it received Dr. Stanley's assessment.

Next, Dr. Genovese, one day later and without examining or speaking to Grubbs, issued her conclusion that Grubbs could perform some light work.  Grubbs argues that Dr. Genovese's assessment was based primarily on Dr. Stanley's cardiac assessment, and not on the substantial amount of documentation that Grubbs provided in connection with his various medical conditions.[18]  Thereafter, Prudential immediately engaged Ms. Carli to prepare a vocational assessment, specifically directing her to the evaluations made by Grubbs's doctors.  Grubbs argues that this effectively limited Ms. Carli's review of his file, and suggests that she did not review any of the documentation that Grubbs provided in connection with his various medical conditions.  Grubbs also notes that Ms. Carli issued her report[19] without interviewing, observing, or examining him, and argues that the jobs listed by Ms. Carli were well beyond his education, training, or experience level.[20]

---

[17]Grubbs also points out that none of these doctors indicated that he could perform significant amounts of physical activity, and Dr. Stanley specifically stated that Grubbs remained "limited."

[18]Grubbs also notes the large number of referrals handled by Dr. Genovese and Ms. Carli.  *See* Pl. Ex. 3.

[19]There is some dispute as to what exactly Ms. Carli relied upon in making her assessment.  *Compare* Pl. Br. at 8 n.5, *with* Def. Reply Br. at 4 n.3.

[20]Grubbs also refers to Dr. Stanley's deposition, in which he stated that Grubbs could not perform the listed jobs or even complete the interview process.  *See* Pl. Ex. 4 at 44, 48, 60, 67-70, 79-81, 83.

Grubbs also points to the large amount of documentation, submitted to Prudential during the period that it was paying benefits, that supported his claim of total disability. Specifically, he points to a February 1998 statement from Dr. Watkins which concluded that there were no work duties that Grubbs could perform. *See* Pl. Ex. 2 at 111-12. In essence, Grubbs is arguing that Prudential ignored years of documentation when it decided to submit his file to Dr. Genovese and Ms. Cali.

Grubbs argues that Prudential has ignored the evidence he submitted during the appeals process, specifically the June 26, 2001 letter of Dr. Watkins and the April 3, 2001 affidavit of Dr. Stanley. Grubbs notes that Dr. Stanley, in his deposition, stood by the conclusions he made in that affidavit. *See* Pl. Ex. 4 at 84. Grubbs argues that any consideration given by Prudential to this additional information was superficial at best, and that it was simply looking for a way to terminate his benefits.[21]

In opposing renewed summary judgment, Grubbs contends that there is new objective evidence of his inability to work which weighs towards total disability in light of his previous medical record and other disability factors, i.e., Dr. Novack's confirmation that Grubbs suffers from dementia, memory loss, and various other psychological disorders, including learning disorders which would impact upon Grubbs entering a new unrelated profession, and Mr. Miller's Vocational Evaluation, which determined Grubbs to be totally and permanently disabled.

Addressing Footnote 11 of this court's January 13, 2003 memorandum opinion, Grubbs

---

[21] While Grubbs previously argued that his file should have been referred to a psychologist or other person with psychiatric training, to review his ability to work in light of his mental conditions, *see* Initial Pl. Ex. 1 at § 1.24, the court notes that Dr. Novack's review would apparently qualify in this regard.

argues, he has now presented evidence that Prudential knew at the time it terminated Grubbs's

disability benefits (and in fact three years earlier than that) that Grubbs fully qualified for SSD

benefits.[22] Grubbs highlights the Social Security Administration's findings of February 15,

1997:

> [Plaintiff] has the following medically determinable impairments: Class 3/marked
> coronary disease; status post angioplasty and quadruple coronary artery bypass
> grafting in 1987, with two of the grafts being redone in September 1994, angina
> with anything more than minimal activity; mild dementia; memory loss; and
> emotional lability.
> [Plaintiff's] impairments, when considered in combination . . . prevent him from
> performing even sedentary work, due to decreased memory and extremely low
> exercise tolerance.
> [Plaintiff] has been "disabled" under 20 CFR § 404.1520(f) since January 15,
> 1996.

*See* Pl. Opp., Ex. 2.

Additionally, Grubbs alleges, there is evidence of Prudential's conflicted actions.  First,

Grubbs contends, by relying upon a physician consultant's opinion in its May 16, 2001

termination letter that Grubbs "could probably do light work, primarily seated," Prudential

applied a subjective as opposed to an objective standard.  Grubbs contends that he has not found

a single decision holding that a person either "(1) qualified for disability benefits because they

were probably unable to work; or (2) were terminated because they were probably able to work."

According to Grubbs, Prudential has failed to show uniformity of contract construction and

fairness in adjusting his claim, as required by *Brown*.  Second, Grubbs argues, Prudential failed

to meet its burden under *Brown* to dispute the assertion that its conflict of interest did not taint its

---

[22]   Grubbs repeats facts cited earlier in this memorandum opinion, i.e., Prudential assisted him in obtaining
SSD benefits in 1997, Prudential noted his need to refund over $12,000, and Grubbs refunded that amount by check
payable to Morrison Knudsen.

judgment.[23]  Grubbs asserts:

> Prudential also did not purge itself from the taint of self-interest when it ignored
> the existence of an external standard by which the reasonableness of its fiduciary's
> conduct may be measured.  Here, a relevant external standard existed in the form
> of the Plaintiff's qualification for an continuous receipt of Social Security Disability
> benefits due to Prudential's assistance . . . . Prudential has not attempted to explain
> why it failed to consider the existence of an external standard.

## C.    Prudential's Reply

In reply, Prudential again argues that the only decision before this court is whether there

was a "reasonable basis' for the decision, "based on the facts as known to [Prudential] at the time

the decision was made." *Brown*, 898 F.2d at 1559.  Prudential also notes that the Plan gave it the

right to review Grubbs's status periodically. *See* Def. Ex. E at 327.  Thus, there was nothing

sinister about sending Grubbs the Activities of Daily Living Questionnaire.  Also, there was

nothing suspect about seeking additional information about Grubbs from his doctors, given that

he reported an ability to perform physical activities such as golfing and fishing.  Prudential

further argues that Dr. Genovese and Ms. Carli simply reached the same conclusions reached by

Grubbs's doctors in the Physical Capacities Evaluations.

Prudential also points to the deposition testimony of Dr. Stanley and Dr. Watkins.  Dr.

---

[23] This court notes the Eleventh Circuit's specific holding in *Brown*:

> [W]hen a plan beneficiary demonstrates a substantial conflict of interest on the part
> of the fiduciary responsible for benefits determinations, the burden shifts to the
> fiduciary to prove that its interpretation of plan provisions committed to its
> discretion was not tainted by self-interest.  That is, a wrong but apparently
> reasonable interpretation is arbitrary and capricious if it advances the conflicting
> interest of the fiduciary at the expense of the affected beneficiary or beneficiaries
> unless the fiduciary justifies the interpretation on the ground of its benefit to the
> class of all participants and beneficiaries.

*Brown* at 1566-67.

Stanley testified that "from a cardiac standpoint, and a vascular standpoint, [Grubbs] could" handle a job. *See* Def. Ex. C at 22. Dr. Watkins testified that Grubbs "should be able to withstand, from a cardiac standpoint, a sedentary job." *See* Def. Ex. B at 31-32. As for Grubbs's cognitive problems, both doctors testified that they never performed any cognitive tests on Grubbs and were not qualified to make cognitive assessments. *See* Def. Ex. B at 16-18, 90-91; Ex. C at 28-29, 90-91. Prudential also notes that Grubbs himself admitted that he has never seen a professional about his cognitive problems (except for the visit to Dr. Novack during this litigation). *See* Def. Ex. D at 75-76. Prudential argues that Grubbs has simply failed to present any objective evidence to support his position.

Addressing Grubbs's opposition to renewed summary judgment, Prudential counters each of plaintiff's arguments, i.e., that Dr. Novack's and Mr. Miller's reports provide new objective evidence of plaintiff's inability to work; that Grubbs's qualification for social security benefits in 1997 is evidence of his claimed disability today; and that Prudential has acted in a conflicted manner in handling Grubbs's claim.

First, Prudential argues, no new objective medical evidence supports Grubbs's claimed disability. According to Prudential, Grubbs mistakenly relies upon Dr. Novack's report to support his position, since Dr. Novack ultimately concluded that Grubbs was not totally disabled from a cognitive standpoint.[24] Furthermore, Prudential argues: "It is extremely telling that

---

[24] Prudential also relies upon Dr. Novack's clarification of his opinion:

I apologize if there was a lack of clarity in my report dated 3-31-03. My reference to Vocational Rehabilitation Services was intended as a means of providing support for Mr. Grubbs in a return to competitive employment. In my opinion he is not totally disabled and should be able to benefit from vocational rehabilitation. It was not my intention to defer to a vocational specialist as to whether Dr. Grubbs is disabled.

plaintiff hired Joseph Miller without the permission of the Court and without informing or seeking input from the Court or Prudential about who should perform such an evaluation. Indeed, it is clear that Joseph Miller is not remotely qualified to offer any opinions as to plaintiff's mental status." Since plaintiff's cardiologist and internist have found Grubbs not to be totally disabled from a cardiac standpoint, Prudential contends, "plaintiff's cognitive status is the gravamen of his claim of total disability." Prudential highlights Dr. Novack's neuropsychological evaluation as the only instance of a professional medical cognitive assessment in the plaintiff's record. Prudential again characterizes its offer (in the latest denial of benefits letter) to pay for vocational assistance as a good will gesture consistent with Dr. Novack's report.

Next, Prudential argues, Miller's reliance on the February 15, 1997 social security finding is misplaced. According to Prudential, Prudential's knowledge of Grubbs's social security disability status in 1997 does not estop Prudential from taking a different position over six years later. The applicable plan, Prudential contends, entitles Prudential to conduct regular reviews of Grubbs's disability status. While admitting Grubbs's disability status in April 1996, Prudential takes the position that the "crux of plaintiff's disability at that time was his cardiac condition, a condition which, according to plaintiff's own physicians, is no longer totally disabling."[25] Prudential alleges that the objective medical evidence most lately reviewed by Prudential supports this claim.

Finally, Prudential contends, Prudential did not apply a subjective standard to its review

_____

See Def. Ex. 3 (letter to Prudential's attorney dated May 6, 2003).

[25] In the "employee statement" on Grubbs's initial disability claim form, Prudential notes, plaintiff listed "heart disease" as the nature of his illness or injury.

23

of Grubbs's claim.  By relying on the single word "probably" in the May 16, 2001 disability

termination letter, Prudential argues, Grubbs is "cherry-picking" and taking the word "entirely

out of context."  Prudential asserts that Dr. Genovese was commenting on plaintiff's cardiac

capabilities and confirming the positions already taken by plaintiff's own cardiologist and

internist.  More importantly, Prudential argues, subsequent to the cited letter, Grubbs's own

physicians unequivocally confirmed their positions regarding plaintiff's cardiac status: Dr.

Stanley opined that from a cardiac and vascular standpoint, Grubbs could handle a job, and Dr.

Watkins similarly opined that Grubbs "should be able to withstand, from a cardiac standpoint, a

sedentary job."  Prudential concludes:

> Prudential's decision to discontinue plaintiff's disability benefits and its recent
> determination confirming that decision were based entirely on the objective
> medical evidence.  In fact, Prudential's decisions were based upon the
> unequivocal statements and testimony of plaintiff's own physicians and that of
> a qualified neuropsychologist chosen by the plaintiff and approved by this Court.
> The only subjective evidence offered has been by the plaintiff, who would have
> this Court make its determination based upon his own subjective analysis of his
> capabilities and the subjective opinion of a hired vocational consultant, rather
> than the determinations previously made by qualified physicians.

### CONCLUSIONS OF THE COURT

This case illustrates why cases such as this should perhaps be decided by totally independent

experts rather than courts.  Without repeating what has been stated above, the court is satisfied that

the ultimate issue is not just in some general way plaintiff's degree of disability, but, more

specifically, whether plaintiff can be deemed to be qualified "or could be qualified by (a) training;

(b) education; or (c) experience" to be a budget officer, controller, or director of records

management (the occupations identified in Prudential's May 16, 2001 denial-of-benefits letter),

and/or to be an order supervisor, administrative assistant, or cost estimator (the occupations

identified in Prudential's August 4, 2003 denial-of-benefits letter).  There is no question that the plaintiff has a degree of disability both physically and cognitively.  Merely having severe coronary heart disease is not, in and of itself, always totally disabling.  Neither is a memory problem.  The combination coupled with age may or may not be totally disabling as to particular jobs.  The defendant has suggested several jobs that plaintiff is or could become qualified for.  This court cannot decide as a matter of law that the defendant's decision in this regard was or was not tainted by its conflict of interest.

The court will deny the defendant's subject motion.  Any trial should focus on the ultimate issue that the court has noted, including evidence regarding (1) what the qualifications for such jobs are or (2) in what way plaintiff is qualified or could become qualified for such jobs.  Obviously plaintiff's age and condition would have a bearing on the latter point.

If both parties agree, the court can decide the case, without a trial, based on the evidence in the record before it.  Within 10 days, each party will advise the court, separately without service on the other party, whether it so agrees or not.  The court will file the parties' responses after receiving both.

This 23rd day of October, 2003.

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE

25